UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BRUCE PHILLIPPI,

        Plaintiff,

    v.

J. CLARK KELSO, et al.,

        Defendants.

Case No. 15-cv-05579-DMR (PR)

**ORDER GRANTING DEFENDANTS' DISPOSITIVE MOTIONS; AND ADDRESSING OTHER PENDING MOTIONS**

## I.    INTRODUCTION

On December 7, 2015, Plaintiff Bruce Phillippi, a state prisoner incarcerated at Centinela State Prison ("CSP"), filed the instant *pro se* civil rights action, pursuant to 42 U.S.C. § 1983, stemming from alleged constitutional violations during his previous incarceration at Pelican Bay State Prison ("PBSP"). Dkt. 1. He names the following Defendants: California Correctional Health Care Services ("CCHCS") Receiver J. Clarke Kelso; and Defendants from PBSP, including Chief Medical Executive J. Bal, Chief Executive Officer Maureen McLean, Physicians M. Sayre and Nancy Adam, and Physician Assistant Laurie Thomas ("PBSP Defendants"). Plaintiff alleges that Defendants were deliberately indifferent to his medical needs starting on April 15, 2015, the date he arrived at PBSP, until the summer of 2016 when he was transferred to CSP.[1] *Id.* at 3-9.[2]

---

[1] The record shows that on August 29, 2016, Plaintiff filed a change of address indicating that he had been transferred out of PBSP on an unspecified date. Dkt. 26.

[2] Page number citations refer to those assigned by the court's electronic case management filing system and not those assigned by the parties.

United States District Court
Northern District of California

Plaintiff initially was housed in PBSP's Administrative Segregation ("Adseg") for a few days before he was transferred to the Security Housing Unit ("SHU") on April 30, 2015. Thomas Decl. ¶ 4; Adam Decl. ¶ 5. Plaintiff seeks declaratory and injunctive relief as well as monetary and punitive damages.

This action has been assigned to the undersigned magistrate judge. Pursuant to 28 U.S.C. § 636(c), with written consent of all parties, a magistrate judge may conduct all proceedings in a case, including entry of judgment. Appeal will be directly to the United States Court of Appeals for the Ninth Circuit. *See* 28 U.S.C. § 636(c)(3). All parties have consented to magistrate judge jurisdiction in this matter. Dkts. 4, 25, 28.

On July 8, 2016, the court found that Plaintiff's complaint adequately alleged a cognizable Eighth Amendment claim of deliberate indifference to his serious medical needs against the named Defendants. Dkt. 12 at 2. The court then served the complaint upon the named Defendants and issued a briefing schedule for filing a dispositive motion. *Id.* at 3-6.

The parties are presently before the court on Defendants' dispositive motions. Dkts. 33, 44.

Defendant Kelso moves for summary judgment and/or summary adjudication[3] on the grounds that there is no triable issue of material fact, as Plaintiff failed to state a cognizable claim because: (1) Defendant Kelso is not a state actor for purposes of 42 U.S.C. § 1983; (2) Defendant Kelso cannot be liable as a supervisor for any alleged Constitutional violations; (3) Plaintiff does not allege, and cannot establish, the requisite elements for Eighth Amendment deliberate indifference to a serious medical need; and (4) Plaintiff cannot dictate his own medical treatment

---

[3] In support of the dispositive motion, Defendant Kelso's attorneys, Martin H. Dodd, Esq. and Jaime G. Touchstone, Esq., have filed an unopposed request for judicial notice ("RJN"). Dkt. 33-2. Good cause appearing, the RJN is GRANTED. The court may take judicial notice of the orders from the *Plata* action and in *Griffin v. Kelso, et al.*, No. 2:10-cv-2525 MCE JFM (PC) (E.D. Cal. 2011), filed as Exhibits 1 through 4 to the RJN, because: (1) a court may consider matters of public record, including pleadings, orders, and other papers filed with the court, *see Mack v. South Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986), *overruled on other grounds*, *Branch v. Tunnell*, 14 F.3d 449 (9th Cir. 1994), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1121 (9th Cir. 2002); and (2) "a court may take judicial notice of its own records in other cases, as well as the records of an inferior court in other cases," *see United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980).

2

and is not entitled to the specific injunctive or declaratory relief he seeks. Dkt. 33 at 8. Defendant Kelso also argues that, as the Receiver, he is entitled to immunity in both his official and individual capacities. *Id.* Plaintiff opposed the motion, and Defendant Kelso filed a reply. Dkts. 37, 40.

The remaining PBSP Defendants move this court to dismiss Plaintiff's official capacity claims, punitive damages claims, and demand for injunctive relief under 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. 44 at 8. These Defendants argue that dismissal "should be granted under 12(b)(6) because Plaintiff's claim for damages against a state official in his or her official capacity is barred by the Eleventh Amendment; Plaintiff failed to allege sufficient facts to establish a punitive damages claim against any Defendant; Plaintiff's claims for injunctive relief are moot; and Plaintiff cannot state a cause of action against Defendants Bal and McLean merely for their involvement with Plaintiff's grievances." *Id.* These Defendants also move for summary judgment on the following grounds: (1) "Plaintiff did not exhaust available administrative remedies regarding specific medical claims asserted in the complaint, and also did not exhaust claims about the adjudication of administrative grievances, as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a)"; (2) "the undisputed material facts based on the evidence shows that [PBSP] Defendants were not deliberately indifferent to Plaintiff's serious medical needs"; and (3) "[PBSP] Defendants are entitled to qualified immunity. *Id.* Plaintiff opposed the motion, and PBSP Defendants filed their reply. Dkts. 51, 55.

Plaintiff also filed a motion for leave to file a surreply to Defendants' replies. Dkt. 56. Defendant Kelso filed an opposition to Plaintiff's motion. Dkt. 58. The Local Rules do not permit the filing of a response to a reply. *See* Civ. L.R. 7-3(d). However, the court shall consider Plaintiff's surreply, which has been signed under penalty of perjury. Dkt. 56 at 2-6. Therefore, Plaintiff is GRANTED leave to file a surreply.

Having read and considered the papers submitted in connection with this matter, the court hereby GRANTS Defendants' dispositive motions as outlined below.

United States District Court
Northern District of California

## II.     FACTUAL BACKGROUND[4]

### A.     Background Relating to Plaintiff's Claims and Defendants' Alleged Involvement

Plaintiff alleges that he has "been diagnosed by [the California Department of Corrections and Rehabilitation ("CDCR")] medical since Jun[e] 1998 as being deformed, with muscle tendon injury and atrophy, and in need of high ankle support."  Dkt. 1 at 3.  He claims he "walks on the edge of his foot, causing pain . . . ."  *Id.*  He also has been "diagnosed by [a] specialist CDCR n[eu]rologist in Aug[ust] 2009 as having bilateral carpal tunnel syndrome [("CTS")] and neuropathy of the . . . media[n] nerves (i.e., CTS) and left and right ulnar nerves at the elbows," which cause nerve pain.  *Id.*  Plaintiff claims that he also has been diagnosed as having "multilevel degenerative disc disease in his neck" since 2008, "migraines" since January 2010, and "hypertension/high blood pressure" since 2005.  *Id.*

As mentioned above, Plaintiff arrived at PBSP on April 15, 2015.  Plaintiff claims that Defendants were deliberately indifferent to his medical needs when he arrived at PBSP, because although they were fully aware of his medical history, and he alleged "great pain and serious injury to his health," they decided: (1) to discontinue previous accommodations for "high ankle support boots," "medical pillow for neck support," and a "knee brace;" (2) to discontinue Gabapentin,[5] his nerve pain medication, without alternative treatment; (3) to remove Paxil,[6] his

---

[4] This Order contains many shortcuts and acronyms.  Here, in one place, they are:

| Adseg | Administrative Segregation |
| CCHCS | California Correctional Health Care Services |
| CDCR | California Department of Corrections and Rehabilitation |
| CTS | Carpal Tunnel Syndrome |
| CSP | Centinela State Prison |
| eUHR | Electronic Unit Health Record |
| ICAB | Inmate Correspondence and Appeals Branch |
| IMSP&P | Inmate Medical Services Policies and Procedures |
| NSAID | Non-Steroidal Anti-Inflammatory Drug |
| PBSP | Pelican Bay State Prison |
| PCP | Primary Care Physician |
| SHU | Security Housing Unit |

[5] Gabapentin, which is known as an anticonvulsant or antiepileptic drug, is used with other medications to prevent and control seizures.  It also is used to relieve nerve pain following shingles in adults.  *See*  http://www.webmd.com/drugs/2/drug-14208-8217/gabapentin-oral/gabapentin-oral/details (last visited July 26, 2017).

[6] Paxil or Paroxetine is used to treat depression, panic attacks, obsessive-compulsive disorder,

4

headache/migraine medication; and (4) not to control his blood pressure—all decisions based on Defendants' "adherence to a policy to deliberately deny medical care to SHU inmates." *Id.* at 2-9.

### i.     Defendant Kelso (Federal Receiver)

Plaintiff alleges that Defendant Kelso, the Federal Receiver, "violated Plaintiff's state and federal constitutional rights, by creating, mandating, and enforcing a policy that is deliberately indifferent to Plaintiff's medical needs and does not serve a legitimate penological interest in regards to Plaintiff." Dkt. 1 at 8. Thus, Plaintiff alleges that his failure to receive appropriate medical care was the result of this "policy," as implemented by Defendant Kelso. *Id.* at 4-6.

#### a.    Background Relating to Appointment of *Plata* Receiver and to Suing Receiver

In *Plata v. Schwarzenegger*, the Honorable Thelton E. Henderson appointed Robert Sillen as Receiver to oversee the delivery of medical care to prisoners incarcerated by the CDCR. *Plata v. Schwarzenegger*, No. C 01-01351 TEH (N.D. Cal. Feb. 14, 2006) (Order Appointing Receiver ("OAR")); Touchstone Decl. & RJN, Ex. 1 ("OAR"). Judge Henderson charged the Receiver with "restructuring day-to-day operations [in the prison medical care system] and developing, implementing, and validating a new, sustainable system that provides constitutionally adequate medical care to all class members as soon as practicable." Touchstone Decl. & RJN, Ex. 1, OAR ¶ I.A. The *Plata* court conferred upon the Receiver the responsibility "to control, oversee, supervise, and direct all administrative, personnel, financial, accounting, contractual, legal, and other operational functions of the *medical* delivery component of the CDCR." *Id.* (emphasis added). Pursuant to the OAR, the Receiver holds "all powers vested by law in the Secretary of the CDCR as they relate to the administration, control, management, operation, and financing of the California prison *medical* health care system. The Secretary's exercise of the above powers is suspended for the duration of the Receivership . . . ." *Id.*, ¶ II.A (emphasis added). Significantly, in the exercise of his duties, "[t]he Receiver and his staff shall have the status of officers and agents of this Court, and as such shall be vested with the same immunities as vest with this Court."

---

anxiety disorders, and post-traumatic stress disorder. *See* http://www.webmd.com/drugs/2/drug-6969-9095/paroxetine-oral/paroxetine-oral/details (last visited July 25, 2017).

*Id.*, ¶ II.F.

Under 28 U.S.C. § 959, "[t]rustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property." It is not necessary for a plaintiff to obtain permission from the court that appointed the Receiver to sue the Receiver outside of the appointing court—at least for his operation of the estate in receivership. *See Med. Dev. Int'l v. Cal. Dep't of Corr. and Rehab.*, 585 F.3d 1211, 1213 (9th Cir. 2009) (Eastern District erred when it dismissed contract action against *Plata* Receiver for lack of jurisdiction due to the plaintiff's failure to obtain permission to sue from the Northern District judge, who appointed Receiver.).

The Receiver can be sued in his official, but not individual, capacity for his acts in conducting the receivership. *See id.* at 1219. "'Actions against the receiver are in law actions against the receivership or the funds in the hands of the receiver, and his contracts, misfeasances, negligences, and liabilities *are official, and not personal*, and judgments against him as receiver are payable only from the funds in his hands.'" *Id.* (quoting *McNulta v. Lochridge*, 141 U.S. 327, 332 (1891) (emphasis in source)). His liability will be satisfied from the funds of the estate in receivership—here, the CDCR, as controlled by the Receiver. *Id.*

Although the Receiver acts pursuant to a court appointment, the Receiver does not have any kind of derivative absolute judicial immunity for his actions in operating the receivership as an ongoing enterprise. *Id.* at 1219-20. And the CDCR does not have derivative receivership immunity based on the fact that it functions as the Receiver's staff and has complied with the Receiver's orders. *See id.* at 1220.

        b.      Background on Defendant Kelso's Appointment and Duties

On January 23, 2008, Defendant Kelso was appointed as the Receiver, subject to the rights and obligations of the OAR, and has acted in that capacity since that date. Kelso Decl. ¶ 2; Touchstone Decl. & RJN, Ex. 2 (Order Appointing New Receiver).

Defendant Kelso does not have any control over custodial functions within CDCR (except for limited aspects of the medical escort system) or disciplinary proceedings against inmates; those

remain within the control and jurisdiction of the Secretary of the CDCR. Kelso Decl. ¶ 2. Defendant Kelso is not a licensed medical professional and, therefore, he has "never been and never will be responsible for determining the appropriate course of medical treatment" for any inmate, including Plaintiff, or otherwise participating in the diagnosis and treatment of any medical condition that Plaintiff or any other inmate may have. *Id.* ¶¶ 3, 8, 9. In the event that Defendant Kelso becomes aware of an inmate complaint, he will refer it to Receivership staff for investigation and handling, including the provision of any care or treatment that medical staff may believe is appropriate. *Id.* ¶ 8.

Since Defendant Kelso's appointment as Receiver, he and his staff at CCHCS have received thousands of medical complaints, inquiries, and requests from inmate-patients and their families about medical care in the prison, each of which is reviewed by a Receivership employee. *Id.* ¶ 6. There are several mechanisms by which inmate-patients may bring concerns about medical care or related safety issues to the attention of CCHCS, including: (1) the inmate-patient grievance process; (2) state habeas petitions; and (3) the Controlled Correspondence Unit ("CCU"). *Id.* ¶¶ 4, 5, 6; *see generally* Lewis Decl. Inmate-patients who are dissatisfied with their medical care can bring their concerns to the Prison Law Office. Kelso Decl. ¶ 7. Plaintiff utilized some of these mechanisms, as further explained below.

According to Defendant Kelso, he never personally met with Plaintiff, never received any correspondence directly from Plaintiff, and was not privy to any correspondence that Plaintiff sent to CCHCS. *Id.* ¶¶ 8, 9. Defendant Kelso adds that at no time was he aware or made aware that Plaintiff was suffering from any serious medical or safety conditions that were not being treated and/or addressed, or that Plaintiff was subjected to any other safety risk. *Id.* ¶ 9.

### ii. Defendant Thomas (Primary Care Physician ("PCP") in Adseg)

Plaintiff asserts a violation of his constitutional rights based on Defendant Thomas's decisions: to discontinue Gabapentin without providing any alternative treatment; to remove Paxil; and to remove his "high ankle support boots," "medical pillow for neck support" (i.e., wedge pillow), and "knee brace." Dkt. 1 at 4.

Defendant Thomas, who is a certified physician assistant, was Plaintiff's PCP during the

7

first few days when Plaintiff was housed in Adseg at PBSP. Thomas Decl. ¶ 29. During that time, Defendant Thomas conducted a lengthy examination and assessment of Plaintiff, during which Plaintiff did not report any pain; reviewed and approved two of his requests for treatment; and documented the pain committee's review and unanimous decision after this action was filed. *Id.* Defendant Thomas's treatment plans for Plaintiff were based on her evaluations of Plaintiff, established standards of care, and guidelines established by the CCHCS' Inmate Medical Services Policies and Procedures ("IMSP&P"). *Id.*

Defendant Thomas claims that at no time during her evaluation of Plaintiff did Plaintiff ever report or express any complaints of pain or suffering. *Id.* Instead, Plaintiff reported that he was exercising regularly. *Id.* Additionally, Defendant Thomas did not change or discontinue Plaintiff's existing prescription for headache prevention (Paxil). *Id.* Instead, Defendant Thomas discontinued one pain medication (Gabapentin) that was not medically necessary for his joint pain and specifically continued Plaintiff's prescriptions for high blood pressure medication and digestive issues, ordered an updated electrocardiogram, updated vaccinations, and monthly blood pressure checks. *Id.* ¶¶ 25, 29. Plaintiff never reported to Defendant Thomas that he was without pain medication, migraine medication, or high blood pressure medication. *Id.* ¶ 29. Moreover, Defendant Thomas states that none of Plaintiff's medical conditions or diagnostic tests indicated or established a medical need for the accommodations in this action, specifically orthotic boots, a knee brace, or a wedge pillow. *Id.*

### iii. Defendant Sayre (Defendant Thomas's Supervising Physician)

Plaintiff claims that Defendant Sayre was deliberately indifferent to Plaintiff's medical needs because Defendant Sayre agreed with Defendant Thomas's recommendations and allegedly ordered his subordinates to deny medical care to Plaintiff to increase his pain and suffering and adhere to the Receiver's "policy" that deliberately denied medical care to PBSP SHU inmates. Dkt. 1 at 4, 8-9. Defendant Sayre was not Plaintiff's PCP during the relevant time frame of this case. Thomas Decl. ¶ 26. Defendant Sayre did not see or treat Plaintiff. *Id.* Defendant Sayre's only participation in this case was a consultation as the supervising physician for Defendant Thomas in April 2015. *Id.* Following Defendant Thomas's April 23, 2015 examination and

evaluations of Plaintiff, Defendant Thomas sought Defendant Sayre's consult regarding her proposed treatment plan and orders for Plaintiff's medical care, and Defendant Sayre concurred with Defendant Thomas's plan for Plaintiff's medical care and treatment. *Id.*

### iv. Defendant Adam (PCP at SHU from April 30, 2015 - December 22, 2015)

Defendant Adam is employed as a physician and surgeon at PBSP. Adam Decl. ¶ 1. Plaintiff alleges that Defendant Adam was deliberately indifferent to his medical needs, because she knew about his medical history and did not give "adequate medical care." Dkt. 1 at 5-6.

Defendant Adam provided medical care and treatment to Plaintiff between April 30 and December 22, 2015, and she reviewed Plaintiff's electronic Unit Health Records ("eUHR") arising from the medical treatment she provided to him during this time. Adam Decl. ¶ 4, Exs. 1-11. During Defendant Adam's approximately eight months as Plaintiff's PCP, she saw Plaintiff five times and monitored and reviewed his treatment to update his care seven times. *Id.* ¶ 5. Defendant Adam spent one hour with Plaintiff during her first examination of him on May 15, 2015. *Id.* ¶ 7. She listened to his concerns, documented his medical history and current symptoms, and examined and evaluated him. *Id.* Defendant Adam documented her findings and specifically noted: Plaintiff's well-built upper body, suggesting he was exercising and working out regularly; and Plaintiff's ability to move his neck and walk in his high-top tennis shoes. *Id.* ¶¶ 10-12. She concluded that Plaintiff's conditions were not affecting his daily living activities and that he did not need special accommodations. *Id.*

Defendant Adam then spent another hour reviewing Plaintiff's 1800 pages of eUHR so she could complete her medical evaluation and establish a treatment plan. *Id.* ¶ 7, Ex. 1. Defendant Adam claims that, under her care, Plaintiff's neck and joint pain, headaches, and high blood pressure were treated continuously based upon the judgment of the medical providers, medical evidence, and supported by diagnostic information, which complies with CDCR polices established by the CPHCS and Title 15 of the California Code of Regulations. *Id.* ¶ 46.

### v. Defendants Bal and McLean (Handled Plaintiff's 602 Inmate Appeals)

As explained below, Plaintiff filed three Inmate/Parole Health Care Appeal Forms (CDCR Form 602 HCs or "602 appeals") addressing the issues in his complaint. *See infra* Factual

Background II.G.  Plaintiff alleges that decisions made by Defendants Bal and McLean, who handled his 602 appeals, were "based on adherence to a policy mandated by [Defendant] Kelso to deliberately deny medical care to PBSP SHU inmates."  Dkt. 1 at 6, 8.  Defendant Bal is the Regional Chief Medical Executive for CCHCS at PBSP.  Robinson Decl. ¶¶ 10, 14, 19.  Defendant Bal conducted the first level reviews on Plaintiff's three relevant health care appeals.  *Id.*  He adjudicated appeal log numbers PBSP HC 15029035, PBSP HC 15029058, and PBSP HC 15029098.  *Id.*  Defendant Bal was not Plaintiff's PCP, and he did not see or treat Plaintiff.  *Id.*

Defendant McLean is the Chief Executive Officer for CCHCS at PBSP.  Robinson Decl. ¶¶ 11, 15, 20.  She conducted the second level reviews on Plaintiff's three relevant health care appeals.  *Id.*  Defendant McLean's second level responses to inmate health care appeals are not clinical.  *Id.*  Her reviews are essentially administrative—ensuring staff correctly implemented the regulatory standards and protocols for administrative appeals.  *Id.*  Defendant McLean was not Plaintiff's PCP, and she did not see or treat Plaintiff.  *Id.*

**B.    Plaintiff's Medical History**

Plaintiff's medical history includes: high blood pressure (hypertension); headaches/migraines; altercations in prison—one of which involved trauma to his stomach, resulting in the removal of most of his pancreas—multiple surgeries; arthroscopies on both knees; a right shoulder arthroscopy; an ankle injury from football, soccer, and basketball; severed tendons/muscles from a parachuting accident through a greenhouse roof; a kick-boxing injury from head butting; and bowel obstruction with resection.  Thomas Decl. ¶ 8; Adam Decl. ¶ 9.

Plaintiff had a history of multiple orthopedic injuries, noted as "misadventures on the streets and altercations in prison."  Adam Decl. ¶ 9.  Plaintiff's medical records indicate he is an admitted "adrenaline junky."  *Id.*  Plaintiff also has a history of digestive and reflux issues associated with the partial removal of his pancreas, requiring replacement enzymes and antacids.  Thomas Decl. ¶ 27.

**C.    Treatment of Plaintiff's Neck and Joint Pain**

Plaintiff's neck and wrist pain began years before he arrived at PBSP, and they were documented in the following medical records: Plaintiff's health care records; the Magnetic

10

Resonance Imaging ("MRI") of his C-spine taken in 2008; the 2009 Electromyogram and Nerve Conductive Study; his neurology consults from November 2011; December 2011 (pain committee notes); and a March 2012 neurology consult. Adam Decl. ¶ 8. Plaintiff's neck pain derives from a combination of old injuries, combined with degenerative disc disease—a degeneration that comes with age. *Id.* ¶¶ 8, 11. Despite Plaintiff's lengthy history of neck pain suggesting possible nerve compression, and complaints of multiple joint pains from his past injuries, he has no loss of daily living activities. *Id.* His history of multiple joint pains from overuse and prior injuries was diagnosed as osteoarthritis. Thomas Decl. ¶ 8.

Plaintiff did not present any joint-related symptoms that met the California Code of Regulation's definition of severe pain. Thomas Decl. ¶¶ 3, 16; *see also* Cal. Code Regs. tit. 15, § 3350(b)(1). To the contrary, Plaintiff stated that he had been exercising regularly—three to four times a week, one hour a day—performing push-ups, steps, pull-ups if his shoulder felt good, and lifting weights, depending on how he felt. Thomas Decl. ¶ 7; Adam Decl. ¶ 11. Thus, there was no severe limitation of function or inability to perform the daily activities of life. *Id.* Physical examinations and observations by Defendants Thomas and Adam both noted Plaintiff's well-built upper body, suggesting his ability to work out regularly. Thomas Decl. ¶ 12; Adam Decl. ¶ 10. Defendant Adam also noted Plaintiff's ability to flip his hair, jerking his head back in a manner that would likely be painful for someone with neck pain, and Plaintiff's frequent stretching of his neck as though attempting to "crack" it. Adam Decl. ¶ 11. Plaintiff previously was prescribed 600 milligrams of Gabapentin three times a day for his pain. Thomas Decl. ¶ 18. However, according to Defendant Thomas, Gabapentin is an anticonvulsant drug and disfavored among pain experts as a treatment for pain, unless the pain has strong neuropathic qualities. *Id.*

Defendant Thomas determined that the focus of Plaintiff's pain was related to his joints, not his nerves. *Id.* Consequently, Defendant Thomas ordered a tapering off of the Gabapentin and referred him to the pain committee for further discussion. *Id.* Defendants Sayre and Adam concurred with this decision. Thomas Decl. ¶¶ 18, 26; Adam Decl. ¶ 15. Plaintiff's Ibuprofen prescription for 600 milligrams three times a day, which reduces arthritis-related joint pain, was still current. Thomas Decl. ¶ 18.

**D.    Treatment of Plaintiff's Headache/Migraine Pain**

At his first PBSP examination, Plaintiff was not suffering from any type of headache. Thomas Decl. ¶ 10.  His last major headache was approximately two months earlier.  *Id.*  A prior neurology consultation diagnosed his headaches as multifactorial, due in part to stress and poor sleep but with many migraineous features including one sided pain on the left temple region, sensitivity to light, sound, and "air hurts."  *Id.*; Adam Decl. ¶ 18.  Plaintiff also reported feeling "seasick" when a headache started.  Thomas Decl. ¶ 10.

When he arrived at PBSP, Plaintiff reported taking Paxil as an aid to prevent his headaches.  *Id.*  He also admits Paxil helps his mood, having told nurses, "I'm a different person when I'm not on this," and having reported, "it doesn't hurt to wake up in a good mood in the morning."  Adam Decl. ¶ 18.  According to Defendant Thomas, Paxil generally is not prescribed for pain or headache prevention.  Thomas Decl. ¶ 10.  Instead, Paxil is prescribed primarily to treat major depressive disorder, generalized anxiety disorder, obsessive-compulsive disorder, panic disorder, post-traumatic stress disorder, and social anxiety disorder.  *Id.*  Under the CCHCS' IMSP&P, antidepressants like Paxil only can be prescribed by a mental health care provider. Thomas Decl. ¶ 11, Ex. B.  Defendant Thomas indicates that an increased risk of suicide associated with Paxil is one reason why any patient prescribed Paxil should be monitored by a mental health provider.  *Id.*  Plaintiff's prescription for Paxil was not altered, but a renewal would have to come from a mental health provider.  *Id.*; Adam Decl. ¶ 13.  Both Defendants Thomas and Adam offered to refer Plaintiff to mental health, but he declined.  *Id.*

**E.    Plaintiff's Accommodations**

Under the CCHCS, accommodations are ordered only when medically necessary.  *See* CCHCS, IMSP&P: Vol. 4, Chap. 23, Section 4.23.1.  When Plaintiff arrived at PBSP, the accommodations approved by his prior prison—specifically his high ankle support boots, knee brace, and wedge pillow—were determined not to be medically necessary.  Thomas Decl. ¶ 19. Although the orthotic boots may have provided Plaintiff with additional support, the high-top tennis shoes he wore were sufficient.  *Id.*; Adam Decl. ¶ 12.

Similarly, an examination revealed that Plaintiff's knee was fine, and therefore the knee

sleeve was not medically necessary.  Thomas Decl. ¶ 19.  Further, the evaluation of Plaintiff's

neck found no medical need for a wedge pillow.  *Id.*; *see* CCHCS, IMSP&P: Vol. 4, Chap. 23,

Section 4.23.1.

**F.      Treatment of Plaintiff's High Blood Pressure**

Plaintiff's history of high blood pressure was diagnosed in 2003 or 2004.  Thomas Decl.

¶ 8, Adam Decl. ¶ 43.  In April 2015, he was on Lisinopril[7] 20 milligrams.  Thomas Decl. ¶ 9.

Following Defendant Thomas's evaluation, she continued Plaintiff's Lisinopril

prescription.  Thomas Decl. ¶ 25.  The chronic care management program for high blood pressure

consists of visits every 180 days and possibly more frequent follow-ups as needed for blood

pressures that are not at goal (greater than 140/90).  Adam Decl. ¶ 40.  In addition, the provider

evaluates other cardiac risks and conducts routine lab work and occasional electrocardiograms.  *Id.*

Blood pressures are checked anywhere from once a week to once every three months.  *Id.*

According to Defendant Adam, because Plaintiff's pressures were elevated intermittently, and

some of his medications intended for other purposes also could affect his blood pressure (for

example, Propranolol[8] or Gabapentin can also lower blood pressure), frequent medication

adjustments were made.  *Id.* ¶ 41.

During Plaintiff's eight months under Defendant Adam's care, Defendant Adam

continually evaluated Plaintiff's blood pressure and modified his medications when needed.

Adam Decl. ¶ 43.  Defendant Adam continued the Lisinopril 20 milligrams and added Propranolol

in June and July.  *Id.*  Propranolol was prescribed primarily with the intent to help prevent or

decrease headaches but had the added benefit of lowering Plaintiff's blood pressure.  *Id.*  After

Plaintiff complained of dizziness from taking Propranolol, Defendant Adam started him on

Clonidine for his blood pressure, in addition to Lisinopril.  *Id.*  When his blood pressure was not as

[7] Lisinopril is used to treat high blood pressure.  *See* http://www.webmd.com/drugs/2/drug-6873-9371/lisinopril-oral/lisinopril-oral/details (last visited July 27, 2017).

[8] Propranolol is a beta blocker used to treat high blood pressure, irregular heartbeats, as well as shaking (tremors), and it also is used to prevent headaches/migraines and chest pain (angina).  *See* http://www.webmd.com/drugs/2/drug-10404-9168/propranolol-oral/propranolol-oral/details (last visited July 25, 2017).

well controlled as it had been on the combination of Propranolol and Lisinopril, Defendant Adam continued him on Clonidine but asked him to switch his Lisinopril to evening dosing. *Id.* Following Defendant Adam's review of Plaintiff's previous lab work, she ordered updated labs to evaluate his condition, including a complete blood count, a comprehensive metabolic panel to check electrolytes and determine the health of his kidneys and liver, lipids to check his cholesterol, electrocardiogram to check the electrical condition of his heart, and a urinalysis to check his kidney function. Adam Decl. ¶ 44. She also ordered weekly checks of Plaintiff's blood pressure so she could monitor his response to medications, a PCP review in thirty days, and a medical follow-up in ninety days when the lab work was completed. *Id.* The treatment plan was to continue monitoring Plaintiff's blood pressure and ensuring his medications did not cause side-effects or negative impacts on his kidney function. *Id.* Defendant Adam's last evaluation of Plaintiff found his pressures were improving on an increased dose of Lisinopril. *Id.*

### G. CCHCS's Pain Management Guidelines

The CCHCS's Pain Management Guidelines were adopted to standardize the effective assessment, treatment, and management of patients with acute and chronic pain. Adam Decl. ¶ 31. It generally is not possible to relieve all pain in patients with chronic pain. *Id.* The goal of treatment is to maximize function while avoiding the serious side-effects of the stronger pain medications or procedures. *Id.*

### H. Plaintiff's Pain Management and Pain Medications

When Plaintiff arrived at PBSP, he had been taking Gabapentin (600 milligrams three times a day), Ibuprofen (600 milligrams, 90 tablets as needed for pain), Paxil (20 milligrams once a day, nurse administered to control headaches), and pancreatic enzymes three times a day. *Id.* ¶ 32, Exs. 1-2.

Inmate-patients usually are given Ibuprofen in tablets that they keep in their cells. Gabapentin and Paxil are both medications that are always nurse-administered. *Id.* ¶ 32.

According to Defendants Thomas and Adam, Plaintiff was tapered off Gabapentin, because Gabapentin was not an appropriate medication for his degenerative disc disease. *Id.*, Ex 1; Thomas Decl. ¶ 18. Instead, Gabapentin is an anticonvulsant drug and disfavored among pain

experts for Plaintiff's type of pain. *Id.* Plaintiff received lesser doses of Gabapentin until the taper completed on May 30, 2015. While tapering off Gabapentin, Plaintiff also was using Ibuprofen (April 15 - May 3, 2015). Before his Gabapentin expired, Defendant Adam started Plaintiff on Sulindac,[9] which continued until June 18, 2015. Adam Decl., Ex. 2.

Throughout Defendant Adam's care of Plaintiff's neck and joint-related issues, she offered and prescribed alternative medications (Trileptal[10] and Non-Steroidal Anti-Inflammatory Drugs ("NSAIDs")[11]) for any further pain. *Id.* ¶ 11. Defendant Adam's treatment plan included Plaintiff continuing exercises as tolerated, stretches learned in physical therapy, and alternative medication for his neck pain (Sulindac). *Id.* ¶¶ 15-16, Exs. 1, 2, 5, 7. Each time Plaintiff presented with any neck or joint pain, Defendant Adam evaluated his symptoms and offered to restart him on one of his prior pain medications. *Id.* ¶¶ 15-16, 36, Exs. 1-12. Each time, Plaintiff refused, telling Defendant Adam that the pain medications—NSAIDs (i.e., Sulindac, Naproxen, Ibuprofen, and Acetaminophen) or Tylenol—were ineffective. *Id.* Had Plaintiff wanted Defendant Adam to reinitiate one of the previously prescribed NSAIDs, Defendant Adam would have done so. *Id.* ¶ 17.

Despite several offers to renew a prior pain medication and provide him with NSAIDs, Plaintiff refused additional pain medication for his neck and joints until March 7, 2016, when Dr. Dorfman (not a named defendant), who was Plaintiff's PCP after Defendant Adam transferred to another health care clinic, started Plaintiff on Salsalate (an NSAID) at 1000 milligrams, twice a day as needed, and Trileptal (a medication Plaintiff previously had told Defendant Adam he did not want to take as it made him drowsy), 150 milligrams at night as needed. *Id.* ¶ 37.

---

[9] Sulindac, a medication known as an NSAID, is used to reduce pain, swelling, and joint stiffness from arthritis. *See* http://www.webmd.com/drugs/2/drug-8714/sulindac-oral/details (last visited July 25, 2017).

[10] Trileptal or Oxcarbazepine is used to treat seizure disorders, but may also be used to treat facial nerve pain, nerve pain of tongue and throat from ninth cranial nerve. *See* http://www.webmd.com/drugs/2/drug-17984-5005/trileptal-oral/oxcarbazepine-oral/details/list-conditions (last visited July 25, 2017).

[11] NSAIDs are among the most common pain relief medicines in the world. *See* http://www.webmd.com/arthritis/features/pain-relief-how-nsaids-work#1 (last visited July 27, 2017).

Simultaneously, Plaintiff also was given Tylenol 650 milligrams, three times a day. *Id.*

According to Defendant Adam, medications for headaches/migraines are usually two-fold—one used as a preventative and the other as a rescue medication when a headache occurs. Adam Decl. ¶ 38. Plaintiff's headaches/migraine prescription for Paxil ended June 25, 2015. *Id.* ¶ 13. Plaintiff admits that Defendant Adam informed him that Paxil only can be prescribed by a mental health care provider. Dkt. 1 at 4. Before the Paxil expiration, however, both Defendants Thomas and Adam offered to refer Plaintiff to mental health if he wanted to continue this prescription, but he refused. Thomas Decl. ¶ 11; Adam Decl. ¶ 13.

Consequently, the initial plan was to taper Plaintiff off the Paxil (which Plaintiff reported was intended as a preventative medication) over a month-long period and start him on Propranolol at 10 milligrams, three times a day. Adam Decl. ¶ 38. Propranolol is a medication commonly used for migraine prevention. *Id.* The Propranolol twice daily was increased to 20 milligrams on July 30, 2015, and 40 milligrams on August 21, 2015. *Id.* Plaintiff continued on the Propranolol twice daily until September 14, 2015, when Plaintiff reported side-effects on the higher dosage. *Id.*

Concerning rescue medication for his headaches, Plaintiff previously told Defendant Adam that he had never found an effective rescue medication, including commonly used Sumatriptan or any NSAIDs. *Id.* From September 14, 2015 to December 2015, there is no record of Plaintiff requesting any other medications to deal with his headaches. *Id.* Had he requested any other medications for this purpose, Defendant Adam would have considered them. *Id.*

**I.    Plaintiff's Relevant 602 Appeals**

If an inmate-patient does not agree with a health care policy, action, or decision, the inmate-patient may submit a 602 appeal to the institution's Health Care Appeal Coordinator, who then will initiate the statewide formal inmate-patient grievance process (also known as the Health Care Appeal Process). Kelso Decl. ¶ 4. If the health care appeal is denied in whole or in part, the inmate-patient may pursue the health care appeal through several levels, culminating in a Director's Level decision, the findings of which are based on an investigation and review into the medical treatment provided to the specific inmate-patient. *Id.* The Receiver does not review

inmate-patient health care appeals or the corresponding decisions. *Id.*

The Inmate Correspondence and Appeals Branch ("ICAB") is responsible for the oversight and management of the Health Care Appeal Process, including maintaining the integrity and accessibility of the process and ensuring that health care-related grievances are addressed effectively and processed in a timely manner. Lewis Decl. ¶ 11. ICAB maintains a file with health care appeal-related documents concerning Plaintiff. *Id.* ICAB Personnel searched Plaintiff's appeal file for the time period of January 1, 2015 to July 14, 2016. *Id.* That review revealed that Plaintiff has submitted three health care appeals, two of which culminated in a Director's Level Decision and one of which was rejected. *Id.* The court elaborates on these aforementioned 602 appeals below.

### i. Appeal Log No. PBSP HC 15029035 ("PBSP HC 15029035")

On April 27, 2015, Plaintiff submitted PBSP HC 15029035, in which he requested the return of his prescription for Gabapentin or a replacement medication for nerve pain and the renewal of his calcium prescription. Robinson Decl. ¶ 9, Ex. B.

Following an interview by the Supervising Registered Nurse, and a first level of review by Defendant Bal, PBSP HC 15029035 was denied at the first level of appeal on June 4, 2015. *Id.* ¶ 10. The denial documented Plaintiff's April 24, 2015 PCP visit and slow tapering off of Gabapentin, his PCP's alternative offer of a low dose NSAID/Tylenol for his multiple orthopedic injuries, and how there was no medical indication for calcium based on his calcium level being within normal limits. *Id.*, Ex. B. Additionally, the denial indicated that Plaintiff had an "extensive visit" with Defendant Adam on May 15, 2015, during which Defendant Adam further explained the tapering off of Gabapentin, offering Trileptal as an alternative, and recommending NSAID for nerve pain. *Id.*

Similarly, on July 10, 2015, Defendant McLean denied Plaintiff's request at the second level of review, noting under Title 15 of the California Code of Regulations § 3354(a), that only qualified medical staff shall be permitted to diagnose illness and prescribe medication and medical treatment for inmates. *Id.* The denial stated: "It is not appropriate for [Plaintiff] to self-diagnose his own medical problems and then expect a medical practitioner to implement [Plaintiff's]

recommendation for the course of medical treatment." *Id.*

Dissatisfied with the second level response, Plaintiff submitted his appeal to the Director's level for review on July 23, 2015. *Id.* Licensed clinical staff conducted a detailed review of Plaintiff's eUHR, noting: his continuous and "ongoing" medical evaluations and treatment (up to August 19, 2015) for his history of neck pain and joint pains; and his PCP's "multiple in-depth assessments," which "noted [a] review of [his] history, current symptoms, and x-ray, magnetic resonance imaging (MRI) scan, and nerve conduction velocity (NCV)/electromyography (EMG) results, and determined there is no medical indication for nonformulary gabapentin." *Id.* The assessments further noted that Plaintiff "declined the offering of alternative formulary pain medications," that the PCP discontinued the calcium supplement due to lack of medical indication, and that a PCP follow up appointment was being scheduled. *Id.* On October 8, 2015, CCHCS Deputy Director for Policy and Risk Management Services Janet Lewis denied the appeal, noting that "no intervention at the Director's Level of Review [was] necessary as [Plaintiff's] medical condition has been evaluated and [Plaintiff was] receiving treatment deemed medically necessary." *Id.*

### ii. Appeal Log No. PBSP HC 15029058 ("PBSP HC 15029058")

On May 12, 2015, Plaintiff submitted PBSP HC 15029058, in which he requested that prison staff return his orthopedic boots by honoring a previous medical chrono[12] for such boots and allow him to speak with a doctor regarding the discontinuation of his prescriptions and medical appliances. *Id.* ¶ 13, Ex. C.

On June 24, 2015, Defendant Bal partially granted the appeal at the first level of review, because Plaintiff's request to speak with a doctor had been satisfied, since Plaintiff had been seen by his PCP on May 15 and June 5, 2015. *Id.* Additionally, Defendant Bal noted that on April 24, 2015, the PCP discontinued Plaintiff's therapeutic shoes/orthopedics due to him having "no chronic muscle/tendon damage or loss of function." *Id.*; *see* IMSP&P: Vol. 4, Chap. 23, § 4.23.1. The reviewer further noted that during Plaintiff's extensive visit with Defendant Adam on May 15,

---

[12] A "chrono" is a form that allows prisoners to request certain medical accommodations as deemed necessary by medical staff.

1 | 2015, Defendant Adam reiterated the reasons for the decision to discontinue his therapeutic

2 | shoes/orthopedics. *Id.*

3 | On August 4, 2015, Defendant McLean partially granted Plaintiff's appeal at the second

4 | level of review. *Id.* Defendant McLean partially granted it because Plaintiff had been seen by his

5 | PCP in May and June 2015, and Defendant McLean further emphasized that Plaintiff would

6 | "continue to be evaluated and treatment would be provided based on [Plaintiff's] clinician's

7 | evaluation, diagnosis, and recommended treatment plan, in accordance with appropriate policies

8 | and procedures." *Id.* However, Defendant McLean denied Plaintiff's appeal relating to his

9 | request for orthopedic boots, noting that the PCP denied such a request because "only qualified

10 | medical staff shall be permitted to diagnose illness and prescribe medication and medical

11 | treatment for inmates." *Id.* Defendant McLean added that the discontinuation of the therapeutic

12 | shoes/orthotics appropriately was determined after a thorough examination, evaluation, and

13 | treatment. *Id.*

14 | Still dissatisfied, Plaintiff submitted his appeal to the Director's level on August 12, 2015.

15 | *Id.* Licensed clinical staff conducted a detailed review of Plaintiff's eUHR, noting: Plaintiff's

16 | ongoing medical evaluations and treatment from his PCP (up to October 19, 2015) for his history

17 | of right foot deformity, ankle pain, and chronic back/neck pain; and his PCP's "multiple in-depth

18 | assessments," which "noted [a] review[] [of his] history, current symptoms, and x-ray, magnetic

19 | resonance imaging (MRI) scan results, and [further] noted that the medication gabapentin is not

20 | indicated for [his] condition and [he was] able to ambulate with tennis shoes, but found increased

21 | support with the use of a boot; however, orthopedic boots were not medically necessary in the

22 | [SHU]." *Id.* Furthermore, Plaintiff was prescribed pain medication, including "ibuprofen and

23 | sulindac." *Id.* (footnote added). On November 5, 2015, Deputy Director Lewis denied PBSP HC

24 | 15029058 at the Director's level, noting that "no intervention at the Director's Level of Review

25 | [was] necessary as [Plaintiff's] medical condition has been evaluated and [Plaintiff was] receiving

26 | treatment deemed medically necessary." *Id.*

27 |       **iii.**    **Appeal Log No. PBSP HC 15029098 ("PBSP HC 15029098")**

28 | On June 7, 2015, Plaintiff submitted PBSP HC 15029098, in which he claimed he

disagreed with the treatment and medication he had been prescribed for headaches/migraines and neck pain, requested treatment previously prescribed by doctors from other prisons—such as Gabapentin (for neck pain) and Paroxetine/Paxil (for headaches/migraines), and demanded treatment by a PCP other than Defendant Adam. *Id.* ¶ 18, Ex. D.

On July 14, 2015, Defendant Bal partially granted the appeal at the first level of review, noting that Plaintiff's PCP had renewed his prescribed Paroxetine/Paxil on July 9, 2015, but denied his request to be treated by a different PCP because Plaintiff "may not be selective in the choice of [PCPs]." *Id.*, Ex. D.

On August 24, 2015, Defendant McLean denied Plaintiff's aforementioned requests at the second level of review, noting that "[p]revious orders from other medical facilities or staff, input from medical consultants, and/or your own personal preferences may be considered, but do not control the professional judgment of your current health care providers." *Id.* Defendant McLean also noted that Plaintiff's prescription for Paroxetine/Paxil was not renewed on August 19, 2015, but that his PCP "increased his prescription for Propranolol to 40 mg for [his] headaches." *Id.* (footnote added).

Plaintiff's submission of PBSP HC 15029098 to the Director's level was rejected by Deputy Director Lewis on September 18, 2015. *Id.* The rejection letter stated that PBSP HC 15029098 was rejected pursuant to Title 15 of the California Code of Regulations § 3084.6(b)(13), because "[t]he appeal is incomplete; for example the inmate or parolee has not provided a signature and/or date on the appeals forms in the designated signature/date blocks provided." *Id.* Deputy Director Lewis provided the following additional instructions, stating as follows: "Your signature, date and why you are dissatisfied with the Second Level response are required in Section F for a Director's Level Review. Complete Section F on the appeal form and resubmit your appeal, along with this letter within 30 calendar days to the ICAB for continued processing." *Id.*

Nothing in Plaintiff's prison record shows that he took the necessary corrective action in order to pursue PBSP HC 15029098 by resubmitting his appeal to the Director's level of review. *Id.*, Ex. A.

### III.     PBSP'S DEFENDANTS' MOTION TO DISMISS

#### A.     Legal Standard

To withstand a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

When considering a 12(b)(6) motion, the court must accept as true all material allegations in the complaint, but it need not accept as true "legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994).  Review is limited to the contents of the complaint, including documents physically attached to the complaint or documents the complaint necessarily relies on and whose authenticity is not contested. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

Courts "construe pro se complaints liberally, especially in civil rights cases." *Litmon v. Harris*, 768 F.3d 1237, 1241 (9th Cir. 2014).  But this liberal construction should not supply essential elements of a claim that were not pleaded. *Id.* (citing *Pena v. Gardner*, 976 F.2d 469, 471 (9th Cir. 1992)).

#### B.     Official-Capacity Damages Claims

PBSP Defendants argue that they are entitled to Eleventh Amendment immunity from damages against them in their official capacities.  Dkt. 44 at 23.  The court agrees.  It is well established that a claim for damages against a state official in his official capacity is barred by the Eleventh Amendment. *See Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *see also Will v. Mich. Dep't. of State Police*, 491 U.S. 58, 71 (1989) (holding "neither a State nor its officials acting in their official capacities" may be sued under section 1983).

Accordingly, PBSP Defendants' motion to dismiss is GRANTED as to their argument that they are immune from suit in their official capacity in federal court.

### C. Punitive Damages Claims

PBSP Defendants argue that Plaintiff has failed to allege sufficient facts to establish a claim for punitive damages against any Defendant. Dkt. 44 at 23. Again, the court agrees. Dismissal of Plaintiff's claim for punitive damages is in order, as punitive damages may be awarded in a section 1983 suit only "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). There is no indication whatsoever that any of PBSP Defendants' alleged wrongdoing rose to this requisite high level of culpability. Accordingly, Plaintiff's claim for punitive damages is DISMISSED.

### D. Injunctive Relief Claims

As mentioned above, Plaintiff seeks both injunctive relief and money damages.

The jurisdiction of the federal courts depends on the existence of a "case or controversy" under Article III of the Constitution. *PUC v. FERC*, 100 F.3d 1451, 1458 (9th Cir. 1996). A claim is considered moot if it has lost its character as a present, live controversy, and if no effective relief can be granted; where the question sought to be adjudicated has been mooted by developments subsequent to filing of the complaint, no justiciable controversy is presented. *Flast v. Cohen*, 392 U.S. 83, 95 (1968). Where injunctive relief is involved, questions of mootness are determined in light of the present circumstances. *See Mitchell v. Dupnik*, 75 F.3d 517, 528 (9th Cir. 1996).

When an inmate has been transferred to another prison and there is no reasonable expectation nor demonstrated probability that he again will be subjected to the prison conditions from which he seeks injunctive relief, the claim for injunctive relief should be dismissed as moot. *See Dilley v. Gunn*, 64 F.3d 1365, 1368-69 (9th Cir. 1995). A claim that the inmate might be re-transferred to the prison where the injury occurred is too speculative to overcome mootness. *Id.*

When Plaintiff filed his original complaint, he was incarcerated at PBSP. He alleged unconstitutional conditions of confinement during the period of his confinement at PBSP from the date he arrived, April 15, 2015, through the date his complaint was filed, December 7, 2015. Plaintiff sought injunctive relief to remedy these alleged injuries. As mentioned above, on August

29, 2016, Plaintiff filed a notice of change of address informing the court he had been transferred to CSP. Dkt. 26. Because Plaintiff has not been incarcerated at PBSP since at least August 2016, to the extent he seeks injunctive relief from the conditions of his confinement at PBSP, those claims are DISMISSED as moot.

**E.     Claims Relating to Grievance Process Against Defendants Bal and McLean**

PBSP Defendants argue that Plaintiff fails to state a claim against Defendants Bal and McLean, because his claim for the handling of an inmate grievance is not actionable. Dkt. 44 at 24. The court agrees.

Other than making broad and conclusory statements, Plaintiff fails to assert any facts showing that Defendants Bal and McLean personally participated in causing the harm alleged by Plaintiff. *See* Dkt. 1 at 6, 8; Dkt. 51 at 6-7. Plaintiff sues Defendants Bal and McLean due to their involvement in handling Plaintiff's grievances. *See id.* Although there is a First Amendment right to petition the government for redress of grievances, there is no right to a response or any particular action. *See Flick v. Alba*, 932 F.2d 728 (8th Cir. 1991) ("prisoner's right to petition the government for redress . . . is not compromised by the prison's refusal to entertain his grievance."). Any claim based on the simple failure to grant administrative appeals or process them properly is not cognizable in a section 1983 action because there is no constitutional right to a prison administrative appeal or grievance system for California inmates. *See Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988); *Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996). Plaintiff therefore has failed to state a claim against Defendants Bal and McLean. Accordingly, Plaintiff's claim against Defendants Bal and McLean relating to the grievance process is DISMISSED with prejudice.[13]

**IV.     MOTIONS FOR SUMMARY JUDGMENT**

As mentioned above, Plaintiff alleges that Defendants were deliberately indifferent to his medical needs when he arrived at PBSP, because he was denied constitutionally adequate medical

---

[13] Because Plaintiff's claims against Defendants Bal and McLean have been dismissed, the court need not address the alternative arguments that Plaintiff failed to exhaust his administrative remedies as to this claim or that these Defendants are entitled to summary judgment on the merits.

United States District Court
Northern District of California

care in the form of lack of treatment, medication, and "medical appliances," when PBSP Defendants: (1) discontinued previous accommodations for "high ankle support boots," "medical pillow for neck support," and a "knee brace;" (2) discontinued Gabapentin, his nerve pain medication, without alternative treatment; (3) removed Paxil, his headache/migraine medication; and (4) failed to control his blood pressure. Dkt. 1 at 2-9. Plaintiff claims he suffers from various medical conditions, including CTS, degenerative disc disease, migraines, hypertension, and high blood pressure. *Id.* Plaintiff alleges that his failure to receive appropriate medical care was the result of a "policy" implemented by Defendant Kelso. Dkt. 1 at 4-6.

The court now resolves the pending motion for summary judgment as to the Eighth Amendment claims in this action against Defendant Kelso and the remaining PBSP Defendants.

### A. Legal Standard for Summary Judgment

Summary judgment is proper where the pleadings, discovery, and affidavits demonstrate that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must demonstrate affirmatively that no reasonable trier of fact could find other than for the moving party. But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The court is only concerned with disputes over material facts and "[f]actual disputes that are irrelevant or unnecessary will not be counted."

24

*Anderson*, 477 U.S. at 248.  It is not the task of the court to scour the record in search of a genuine issue of triable fact.  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment.  *Id.*  If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law."  *Celotex*, 477 U.S. at 323.

For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party.  *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

The failure to exhaust administrative remedies is an affirmative defense that must be raised in a motion for summary judgment.  *See Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (en banc).  The defendants have the initial burden to prove "that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy."  *Id.* at 1172.  If the defendants carry that burden, "the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him."  *Id.*  The ultimate burden of proof remains with defendants, however.  *Id.*  "If material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts."  *Id.* at 1166.

### B.    Evidence Considered

A district court may consider only admissible evidence in ruling on a motion for summary judgment.  *See* Fed. R. Civ. P. 56(e); *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

In support of his dispositive motion, Defendant Kelso has presented his own declaration, as well as declarations and supporting exhibits from the following: Jaime G. Touchstone, Esq. (Defendant Kelso's attorney); and Deputy Director Lewis.  Dkts. 33-2 – 33-4.

In support of their dispositive motion, PBSP Defendants have presented declarations, as well as supporting exhibits from the following: Defendants Adam and Thomas; and ICAB Chief R. Robinson.  Dkts. 45-47

Meanwhile, Plaintiff has filed a verified complaint (dkt. 1), verified surreply (dkt. 56), as

1    well as verified oppositions and declarations in support of his oppositions to Defendant Kelso's

2    and PBSP Defendants' dispositive motions (dkts. 37, 51). The court will construe these filings as

3    affidavits under Federal Rule of Civil Procedure 56, insofar as they are based on personal

4    knowledge and set forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55

5    F.3d 454, 460 & nn.10-11 (9th Cir. 1995).

6        **C.    Applicable Law**

7         Deliberate indifference to serious medical needs violates the Eighth Amendment's

8    proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104

9    (1976). A determination of "deliberate indifference" involves an examination of two elements: the

10   seriousness of the prisoner's medical need and the nature of a defendant's response to that need.

11   *See McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds*, *WMX*

12   *Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

13        To prevail on this claim, the plaintiff must show that his medical needs were objectively

14   serious, and that the defendants possessed a sufficiently culpable state of mind. *See id.* at 1060;

15   *Leer v. Murphy*, 844 F.2d 628, 633-34 (9th Cir. 1988).

16        A "serious" medical need exists if the failure to treat a prisoner's condition could result in

17   further significant injury or the "[u]nnecessary and wanton infliction of pain." *McGuckin*, 974

18   F.2d at 1059 (citing *Estelle*, 429 U.S. at 104). The existence of an injury that a reasonable doctor

19   or patient would find important and worthy of comment or treatment; the presence of a medical

20   condition that significantly affects an individual's daily activities; or the existence of chronic and

21   substantial pain are examples of indications that a prisoner has a "serious" need for medical

22   treatment. *Id.* at 1059-60 (citing *Wood v. Housewright*, 900 F.2d 1332, 1337-41 (9th Cir. 1990)).

23        Regarding the second element, deliberate indifference is a disregard of harm of which the

24   actor is actually aware. *Farmer v. Brennan*, 511 U.S. 825, 838-42 (1994). "[T]he official must

25   both be aware of facts from which the inference could be drawn that a substantial risk of serious

26   harm exists, and he must also draw the inference." *Id.* at 837. A defendant is only liable if he

27   knows that a plaintiff faces "a substantial risk of serious harm and disregards that risk by failing to

28   take reasonable measures to abate it." *Id.* at 847. A mere difference of opinion as to which

                                            26

medically-acceptable course of treatment should be followed does not establish deliberate indifference. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989); *see also Toguchi v. Chung*, 391 F.3d 1051, 1059 (9th Cir. 2004).

In the context of deliberate indifference to serious medical need, an administrator or supervisor may be liable if, for instance, he or she fails to respond to a prisoner's request for help. *Jett v. Penner*, 439 F.3d 1091, 1098 (9th Cir. 2006). "It has long been clearly established that supervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates, for his acquiescence in the constitutional deprivations of which the complaint is made, or for conduct that showed a reckless or callous indifference to the rights of others." *Preschooler II v. Clark County Sch. Bd. Of Trs.*, 479 F.3d 1175, 1183 (9th Cir. 2007) (internal brackets, quotation marks, and citations omitted). A supervisor therefore generally is liable "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quotation marks and citation omitted). "The requisite causal connection can be established . . . by setting in motion a series of acts by others, . . . or by knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury." *Id.* at 1207-08 (internal quotation marks and citation omitted).

### D. Defendant Kelso's Motion for Summary Judgment

In the motion for summary judgment, Defendant Kelso concedes that, as alleged, Plaintiff's health condition may rise to the level of a serious medical need. Dkt. 33 at 18. However, Defendant Kelso argues, inter alia, that Plaintiff cannot state a deliberate indifference claim against the Receiver because: (1) Defendant Kelso is not a medical care provider and has no decision-making power in individual cases; (2) he was not involved personally in Plaintiff's care at any time; and (3) he personally was not aware of Plaintiff's medical needs. Dkt. 33 at 17-20. Plaintiff opposes the motion and argues, inter alia, that Defendant Kelso implemented a "policy," which is the reason Plaintiff has not received constitutionally adequate medical care at PBSP.

Dkt. 37 at 1.

First, the court finds unavailing Plaintiff's argument that his failure to receive appropriate medical care was the result of a "policy" implemented by Defendant Kelso. *See* Dkt. 1 at 4-6. Plaintiff generally describes the "policy" as a "policy mandated by J. Clark Kelso, to deliberately deny medical care of Pelican Bay SHU inmates, and had no legitimate penological interest." *Id.* at 6. However, Plaintiff does not elaborate on what specific "policy" he is referring to, what type of medical care he was refused due to the "policy" being implemented, or how such a "policy" was unconstitutionally applied to him. *See generally* Dkt. 1. Plaintiff attempts to generalize PBSP's medical staff's decision to deny his "medications and medical appliances" as being "due to a policy." *Id.* at 4. However, Plaintiff describes the "policy" at issue as a "Pelican Bay SHU Medical Policy," and elaborates that such a policy instructs PBSP medical staff that "they are required to give medical attention if you can[']t wipe yourself or feed yourself." *Id.* Yet he does not identify this "policy" more specifically. The only specific policy mentioned in Plaintiff's opposition is CCHCS's "Durable Medical Equipment and Medical Supply Policy." Dkt. 37 at 2, 4. But, again, Plaintiff neither explains this policy's significance nor provides evidence that: (1) Plaintiff was denied certain medical care under such a policy; (2) such a policy is the reason he was denied medical treatment; (3) such a policy was implemented by Defendant Kelso; or (4) that Defendant Kelso acted contrary to his authority in developing or implementing such a policy. *See generally* Dkts. 1, 37. Therefore, Plaintiff only makes conclusory allegations that Defendant Kelso implemented a "policy" that deliberately denied medical care to PBSP SHU inmates. Conclusions masquerading as facts are insufficient to hold Defendant Kelso accountable. *See Marks v. United States*, 578 F.2d 261, 263 (9th Cir.1978) ("Conclusory allegations unsupported by factual data will not create a triable issue of fact.") (citation omitted).

The record shows that PBSP medical staff followed the guidelines established by the CCHCS' IMSP&P, and their health care decisions regarding Plaintiff were "guided by [their] professional training and experiences." *See* Thomas Decl. ¶ 3. The IMSP&Ps that were applicable to Plaintiff include: (1) IMSP&P for prescribing antidepressants like Paxil, which "can only be prescribed by a mental health care provider" *id.* ¶ 11, Ex. B; and (2) IMSP&P for ordering

28

accommodations (such as Plaintiff's requests for high ankle support boots, a knee brace, and a wedge pillow) "only when medically necessary" *id.* ¶ 19, *see also* CCHCS, IMSP&P Vol 4, Chap. 23, Section 4.23.1. The court finds that the IMSP&P requiring that prescriptions for Paxil only be ordered by a mental health care provider displayed a legitimate penological interest, because there exists an "increased risk of suicide associated with Paxil . . . ." *Id.* ¶ 11. Similarly, the IMSP&P for ordering accommodations are dependent upon the existence of "medical necessity, [which] means health care services that are determined by the attending health care provider to be reasonable and necessary to protect like, prevent significant illness or disability, or alleviate severe pain, and are supported by health outcome data (diagnostics tests or labs) as being effective medical care." *Id.* at 3 (citing Cal. Code Regs., tit. § 3350(b)(1)). Thus, the court finds that ordering accommodations based upon the existence of "medical necessity" also amounts to a legitimate penological interest.        Furthermore, the record shows that during the timeframe at issue, Defendant Kelso's staff, and not Defendant Kelso himself, reviewed two letters from Plaintiff dated June 1, 2015 and October 6, 2015, in which he complained about the issues raised in this action and inquired about the status of his relevant health care appeals. The staff members are ICAB personnel at the CCU. Lewis Decl. ¶¶ 7-9, Exs. 5, 6.

      As to the June 1, 2015 letter, ICAB personnel reviewed and researched the allegations contained in that letter, which was addressed to "CPHCS (Federal Receiver) Controlled Correspondence Unit," directed to "Federal Receiver About CDC[R] Medical," and alerted them that Plaintiff's "medical prescriptions and appliances" were taken from him upon his transfer to PBSP. *Id.* ¶ 8, Ex. 5. Plaintiff specifically indicated that he had appealed his complaints "via medical 602" and that the "602 reviewer" "could not over turn his superior[']s decision." *Id.*, Ex. 5. He stated that his letter was notifying them that "CDCR's medical staff in [PBSP] are not following the Title 15 appeal procedures." *Id.* On July 10, 2015, an ICAB Health Care Services Representative responded and determined that his June 1, 2015 letter related to appeal log numbers PBSP HC 15029035 and PBSP HC 15029098. *Id.* ¶ 8, Exs. 5, 7. The response states that "[Plaintiff's] appeals, #PBSP HC 15029098 and PBSP HC 15029035, were submitted at the institutional level." *Id.*, Ex. 7. Plaintiff was directed as follows: "Please contact the Health Care

Appeals Coordinator at your institution to address your concerns." *Id.*

Meanwhile, as to October 6, 2015 letter, ICAB personnel reviewed and researched the allegations contained in that letter, which was addressed to "Health Care Appeals, J. Kelso, Chief" but directed to the "Third Level Medical Appeals." *Id.* ¶ 9, Exs. 6, 8. The letter states:

> I have sent 602 # 15029058 and 602 # 15029035 to the 3rd level (your office) and have yet to get confirmation of your receipt.
>
> Could you please do so and/or give me a status update on those two?
>
> It would be greatly appreciated.

*Id.*, Ex. 6. On November 4, 2015, an ICAB Health Care Services Representative responded and alerted Plaintiff that: (1) appeal log numbered PBSP HC 15029058 had been "received on August 28, 2015, and is currently under review," and that he would "be notified in writing once a determination ha[d] been made." *Id.*, Ex. 8. Plaintiff also was informed that "[his] appeal PBSP HC 15029035 was reviewed [on] July 30, 2015, answered and returned to [him] by ICAB on October 8, 2015." *Id.* The response also indicated that "[t]his decision exhausted [his] administrative remedies." *Id.*

ICAB personnel searched Plaintiff's health care appeal file for the period of "January 1, 2015 to July 14, 2016," and that review revealed Plaintiff indeed had submitted three health care appeals related to the issues in this case: appeal log numbers PBSP HC 15029035; PBSP HC 15029058; and PBSP HC 15029098. *Id.* ¶¶ 11-14. As explained, two of the health care appeals culminated in a Director's Level Decision, and one of which was rejected. *Id.* ¶ 11, Exs. 9-11.

The court finds that Plaintiff has failed to provide evidence that Defendant Kelso knew that Plaintiff faced a substantial risk of serious harm and then disregarded that risk by failing to take reasonable steps to abate it. *See Farmer*, 511 U.S. 825, 837 (1994). Further, Plaintiff has failed to demonstrate that, as a supervisor, Defendant Kelso should have known that his actions would have resulted in a constitutional injury. *See Starr*, 652 F.3d at 1208. As an administrator, Defendant Kelso does not examine or treat patients and was not involved personally in the medical care of Plaintiff. Kelso Decl. ¶¶ 3, 9. The record shows that Defendant Kelso is responsible for "bringing the level of medical care provided to California's inmates up to federal constitutional standards."

*Id.* ¶ 2. He "rarely focus[ed] on instances of individual inmate care given at the institutional level nor would it [have been] feasible for [him] to be involved in decisions regarding individual inmates." *Id.* ¶ 3. He made broad policy decisions affecting more than 100,000 inmates in thirty-four prisons to "remedy the systemic problems within the prison medical health care system." *Id.*

In sum, viewing the evidence in the light most favorable to Plaintiff, the undisputed evidence shows that Plaintiff wrote two letters complaining about his medical treatment, that ICAB personnel followed up on the letters, and that Defendant Kelso had no knowledge of the purported constitutional violations. There is no genuine issue of material fact as to whether Defendant Kelso acted with deliberate indifference to Plaintiff's medical needs. Accordingly, he is entitled to judgment as a matter of law, and his motion for summary judgment is GRANTED.[14]

### E.    PBSP Defendants' Motion for Summary Judgment

#### i.    Motion for Summary Judgment Based on Failure to Exhaust

PBSP Defendants argue that Plaintiff did not exhaust available administrative remedies regarding certain medical claims asserted in the complaint and also did not exhaust claims about the adjudication of administrative grievances, as required by the PLRA. Dkt. 44 at 26-27.

It bears repeating that Plaintiff claims that he was denied constitutionally adequate medical care when Defendants: (1) discontinued previous accommodations for "high ankle support boots," "medical pillow for neck support," and a "knee brace;" (2) discontinued Gabapentin without alternative treatment; (3) removed Paxil; and (4) failed to control his blood pressure. Dkt. 1 at 2-9. However, PBSP Defendants claim that Plaintiff did not exhaust administrative remedies regarding his medical claims relating to: (1) the removal of Paxil; (2) the failure to control his blood pressure; (3) medical malpractice; or (4) medical negligence. Dkt. 44 at 26.

Before turning to its analysis, the court briefly reviews the requirements of the PLRA and administrative review process applicable to California prisoners.

##### a.    Legal Framework

The PLRA requires a prisoner to exhaust "available administrative remedies" before

---

[14] Because the court grants Defendant Kelso's motion for summary judgment on the merits, it need not address his other arguments.

1    bringing an action with respect to prison conditions.  42 U.S.C. § 1997e(a).  "[T]he PLRA's

2    exhaustion requirement applies to all inmate suits about prison life, whether they involve general

3    circumstances or particular episodes, and whether they allege excessive force or some other

4    wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

5         Exhaustion of all "available" remedies is mandatory; those remedies need not meet federal

6    standards, nor must they be "plain, speedy, and effective."  *Booth v. Churner*, 532 U.S. 731, 739-

7    40 (2001).  The PLRA requires *proper* exhaustion of administrative remedies.  *Woodford v. Ngo*,

8    548 U.S. 81, 83 (2006).  "Proper exhaustion demands compliance with an agency's deadlines and

9    other critical procedural rules because no adjudicative system can function effectively without

10   imposing some orderly structure on the course of its proceedings."  *Id.* at 90-91.  Thus,

11   compliance with prison grievance procedures is required by the PLRA to exhaust properly.  *Id.*

12   The PLRA's exhaustion requirement cannot be satisfied "by filing an untimely or otherwise

13   procedurally defective administrative grievance or appeal."  *Id.* at 84.

14        The CDCR provides its inmates and parolees the right to appeal administratively "any

15   policy, decision, action, condition, or omission by the department or its staff that the inmate or

16   parolee can demonstrate as having a material adverse effect upon his or her health, safety, or

17   welfare."  Cal. Code Regs. tit. 15, § 3084.1(a).[15]

18        As mentioned above, to initiate an appeal, the inmate or parolee must submit a 602 appeal

19   or grievance describing the issue to be appealed to the Appeals Coordinator's office at the

20   institution or parole region for receipt and processing.  *Id.* § 3084.2(a)-(c).  The level of detail in

21   an administrative grievance necessary to exhaust a claim properly is determined by the prison's

22   applicable grievance procedures.  *Jones v. Bock*, 549 U.S. 199, 218 (2007).  The level of

23   specificity required in the appeal is described in the California Code of Regulations as follows:

24               The inmate or parolee shall list all staff member(s) involved and
             shall describe their involvement in the issue.  To assist in the
25           identification of staff members, the inmate or parolee shall include

26   _____

27   [15] The regulations pertaining to the inmate appeal process were amended effective January 28,
     2011.  As explained below, Plaintiff's grievances were submitted *after* January 28, 2011;
28   therefore, the amended regulations were in effect and govern his grievances.

the staff member's last name, first initial, title or position, if known, and the dates of the staff member's involvement in the issue under appeal.

Cal. Code Regs. tit. 15, § 3084.2(a)(3) (emphasis added).

The CDCR's appeal process consists of three formal levels of appeals: (1) first formal level appeal filed with one of the institution's appeal coordinators, (2) second formal level appeal filed with the institution head or designee, and (3) Director's Level or the third formal level appeal filed with the CDCR director or designee. *Id.* §§ 3084.7.[16]  A prisoner exhausts the appeal process when he completes the third level of review. *Id.* § 3084.1(b); *Harvey v. Jordan*, 605 F.3d 681, 683 (9th Cir. 2010). A "cancellation or rejection" of an appeal "does not exhaust administrative remedies." Cal. Code Regs. tit. 15, § 3084.1(b).

b.  Analysis

1.  Defendants' Initial Burden of Proving a Failure to Exhaust

As mentioned above, Plaintiff had submitted three inmate grievances while he was at PBSP, two of which culminated in a Director's Level Decision, and one of which was rejected. Lewis Decl. ¶ 11.  PBSP Defendants claim that Plaintiff only exhausted two health care appeals and the relevant exhausted issues were related to: the return of his prescription for Gabapentin or a replacement medication for nerve pain (PBSP HC 15-029035); and requests for the return of his orthopedic boots and to be seen by another doctor regarding discontinuation of his prescriptions and medical appliances (PBSP HC 15-029058).  Dkt. 44 at 26.  Defendants argue that "the remaining allegations in Plaintiff's complaint are not contained in his two exhausted health care appeals numbers PBSP HC 15-029035 and PBSP HC 15-029058." *Id.* (citing Robinson Decl. ¶ 22).  The record shows that in his third appeal, PBSP HC 15029098, Plaintiff raised his medical claims relating to the following issues: (1) his disagreement with the treatment and medication that had been prescribed for headaches/migraines and neck pain; (2) his request for treatment previously prescribed by doctors from other prisons, such as Gabapentin (for neck pain) and Paroxetine/Paxil (for headaches/migraines); and (3) his demand for treatment by a PCP other than

---

[16] Under the regulations, as amended effective January 28, 2011, the informal grievance level has been omitted and there are now only three levels: first level appeal, second level appeal, and third level appeal.  *See* Cal. Code Regs. tit. 15, § 3084.7.

United States District Court
Northern District of California

Defendant Adam. Robinson Decl. ¶ 18, Ex. D. However, PBSP HC 15029098 was rejected at the Director's Level, and nothing in Plaintiff's prison records show that he took the necessary corrective action in order to pursue PBSP HC 15029098 by resubmitting his appeal.

Because there is nothing in Plaintiff's prison record showing that he submitted grievances to the final level of review appealing medical claims related to the removal of Paxil for his headaches/migraines, the failure to control his blood pressure, medical malpractice, or medical negligence, PBSP Defendants claim he did not exhaust his administrative remedies as to these claims, and they are entitled to summary judgment on those claims. *Id.*

Plaintiff was advised that he could resubmit PBSP HC 15029098 to the Director's Level, but nothing in his prison record shows that he did so. Because the "rejection" of PBSP HC 15029098 "does not exhaust administrative remedies," *see* Cal. Code Regs. tit. 15, § 3084.1(b), the evidence submitted by PBSP Defendants satisfies their initial burden of proving that there were available administrative remedies for Plaintiff, and that Plaintiff failed to exhaust those remedies properly, *see Albino*, 747 F.3d at 1172.

2.    Plaintiff's Burden of Proving Unavailability of Administrative Remedies

PBSP Defendants adequately have shown that there were available administrative remedies that Plaintiff did not exhaust fully as to his medical claims relating to: (1) the removal of Paxil for his headaches/migraines; (2) the failure to control his blood pressure; (3) medical malpractice; or (4) medical negligence. As such, the burden shifts to Plaintiff "to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1166. An administrative remedy is not available "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross v. Blake*, 136 S. Ct. 1850, 1863 (2016) (citing as examples *Woodford*, 548 U.S. at 102 along with various appellate court cases addressing "a variety of instances in which officials misled or threatened individual inmates so as to prevent their use of otherwise proper procedures."). Therefore, to show that an administrative remedy is not available, Plaintiff may allege that prison

officials thwarted him from taking advantage of a grievance process.  *See id.*

In a declaration filed in support of his opposition, Plaintiff claims that he "did receive, then comply with, and resend the administrative appeal #PBSP-HC-15029098 into the prison mail system within 30 days of the rejection letter . . . ."  Dkt. 51 at 24.  Plaintiff claims that "[d]ue to harassment and actions by CDCR staff once [PBSP HC 15029098] was in their possession and out of his control, it is possible that it was trifled with or intercepted by harassing staff prior to reaching the 3rd level."  *Id.* at 14.  Because Plaintiff's declaration is filed under penalty of perjury, and because, at summary judgment, the court must view the facts in the light most favorable to the nonmoving party, *see Leslie*, 198 F.3d at 1158, the court finds that Plaintiff has come forward with evidence showing that administrative remedies may have been unavailable to him because prison officials "thwarted" him from resubmitting PBSP HC 15029098 to the Director's level, *see Ross*, 136 S. Ct. at 1863.  Accordingly, Plaintiff has met his burden to show that there was something in his particular case that may have made generally available administrative remedies effectively unavailable to him.  *See Albino*, 747 F.3d at 1172.

### c.   PBSP Defendants' Ultimate Burden of Proving Unexhaustion

In sum, PBSP Defendants have not met their ultimate burden of presenting evidence of a failure to exhaust, because Plaintiff has disputed such a claim by swearing under penalty of perjury that prison officials "thwarted" him from resubmitting PBSP HC 15029098 to the Director's level.  Thus, Plaintiff has presented evidence that precludes summary judgment.

Accordingly, PBSP Defendants' motion for summary judgment is DENIED on the ground that Plaintiff failed to exhaust his administrative remedies as to his medical claims relating to: (1) the removal of Paxil for his headaches/migraines; (2) the failure to control his blood pressure; (3) medical malpractice; or (4) medical negligence.

### ii.   **Motion for Summary Judgment Based on Alternative Arguments**

The court will now consider PBSP Defendants' alternative argument that: (1) "the undisputed material facts based on the evidence shows that [PBSP] Defendants were not deliberately indifferent to Plaintiff's serious medical needs"; and (2) "[PBSP] Defendants are entitled to qualified immunity."  Dkt. 44 at 8, 27-31.

As set forth above, deliberate indifference to serious medical needs violates the Eighth Amendment's prohibition against cruel and unusual punishment. *See Estelle*, 429 U.S. at 104. The analysis of a claim of "deliberate indifference" to serious medical needs involves an examination of two elements: (1) a prisoner's serious medical needs and (2) a deliberately indifferent response by the defendants to those needs. *McGuckin*, 974 F.2d at 1059.

PBSP Defendants seem to concede that, as alleged, Plaintiff's health condition may rise to the level of a serious medical need. Instead, they argue Plaintiff cannot establish that any Defendant was deliberately indifferent to his serious medical needs because, "for those Defendants who treated and evaluated Plaintiff or reviewed his PCP's recommendations and orders, the evidence shows that their decisions were properly based on their evaluation and treatment of Plaintiff, his medical records and diagnostic tests, and applicable prison healthcare guidelines." Dkt. 45 at 28.

A prison official is deliberately indifferent if he or she knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer*, 511 U.S. at 837. In order to establish deliberate indifference, a plaintiff must show a purposeful act or failure to act on the part of the defendant and a resulting harm. *McGuckin*, 974 F.2d at 1060. Such indifference may appear when prison officials deny, delay, or intentionally interfere with medical treatment, or it may be shown in the way in which prison officials provided medical care. *See id.* at 1062.

Here, the court again reiterates that Plaintiff claims he was denied constitutionally adequate medical care when PBSP Defendants: (1) discontinued previous accommodations for "high ankle support boots," "medical pillow for neck support," and a "knee brace;" (2) discontinued Gabapentin without alternative treatment; (3) removed Paxil; and (4) failed to control his blood pressure. Dkt. 1 at 2-9. In his opposition, Plaintiff claims that PBSP Defendants "chose to do this, [even] though all had access to [his] file and were made aware of his complaints of pain." Dkt. 51 at 1. He adds that "their decisions were based on their inferior medical knowledge and adherence to a medical policy that was cruel and unusual to Plaintiff specifically, and to inmates generally." *Id.*

To the extent that Plaintiff's claim amounts to medical malpractice or an allegation that PBSP Defendants were negligent in providing treatment—such allegations do not support an Eighth Amendment claim. *See Franklin v. State of Or., State Welfare Div.*, 662 F.2d 1337, 1344 (9th Cir. 1981); *Toguchi*, 391 F.3d at 1060; *McGuckin*, 974 F.2d at 1059 (mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights); *O'Loughlin v. Doe*, 920 F.2d 614, 617 (9th Cir. 1990) (repeatedly failing to satisfy requests for aspirins and antacids to alleviate headaches, nausea, and pains is not constitutional violation; isolated occurrences of neglect may constitute grounds for medical malpractice but do not rise to level of unnecessary and wanton infliction of pain). Despite Plaintiff's claims that he received inadequate or no treatment for neck and joint pain, headaches, and high blood pressure, the medical records show that his conditions and complaints were treated continuously based upon the medical evidence as well as the judgment of the medical providers (Defendants Thomas and Adam), and the treatment was supported by diagnostic information. *See* Adam Decl. ¶¶ 45-47; Thomas Decl. ¶¶ 29, 31, 33; Robinson Decl. ¶¶ 12, 17, Exs. B, C. Moreover, Plaintiff's claims that prior medications (Gabapentin and Paxil) controlled his symptoms do not mean they were the appropriate medication for his conditions. Under Title 15 of the California Code of Regulations § 3354(a), only qualified medical staff shall be permitted to diagnose illness and prescribe medication and medical treatment for inmates—it is not appropriate for Plaintiff to self-diagnose his own medical problems and then expect a medical practitioner to implement his own recommendation for the course of medical treatment. *See* Cal. Code Regs. tit. 15, § 3354(a). The undisputed medical evidence established a consensus between medical professionals—Defendants Thomas, Sayre, and Adam—that prescribing Gabapentin and Paxil was not appropriate for Plaintiff's conditions. Additionally, PBSP Defendants' treatment plan included continuing Plaintiff's stretches and in-cell physical therapy, alternative medications, and continuous offers of NSAIDs. The medical evidence shows that each time Plaintiff presented with any neck or joint pain, he was evaluated and offered a prior pain medication, commonly prescribed for his conditions, and each time, he refused. *See* Adam Decl. ¶¶11, 14-15, 21, 23, Exs. 1, 2, 5, 7. Had Plaintiff wanted to reinitiate an appropriate, previously-prescribed alternative pain

medication, he would have received one.  *See id.* ¶ 17.

Similarly, the record shows that established policies require antidepressants like Paxil to be prescribed by a mental health provider.  *See* Thomas Decl. ¶ 11, Ex. B.  PBSP Defendants' offers to refer Plaintiff to mental health for a renewal were rejected.  *Id.* ¶ 10; Adam Decl. ¶ 13.  Alternatively, Defendant Adam prescribed Propranolol, which is a medication commonly used for migraine prevention.  *See* Adam Decl. ¶ 38.  Modifying the dosage three times accommodated Plaintiff's needs, until Plaintiff reported side-effects on the increased dose.  *Id.*  Between September 14, 2015 and December 2015, there is no record of Plaintiff requesting any other medications for headaches/migraines.  *Id.*  Defendant Adam claims that had Plaintiff requested any other medication for headaches/migraines, Defendant Adam would have considered them.  *Id.*  Furthermore, the undisputed evidence supported by medical records shows that Plaintiff's high blood pressure was monitored continuously and his prescribed medications modified when needed.  *See id.* ¶ 43.  In fact, his blood pressure readings were improving on an increased dose of his last prescribed medication, Lisinopril.  *Id.* ¶ 44.

In sum, the undisputed evidence supported by medical records shows no evidence to suggest that any of Plaintiff's medical conditions inferred a substantial risk of serious harm or that his requests for medical treatment were ignored and could have resulted in further injury.  Even if Plaintiff claims he should have received different treatment for his medical needs, a difference of opinion as to the urgency and treatment of his medical needs is insufficient, as a matter of law, to establish deliberate indifference.  *See Toguchi*, 391 F.3d at 1058, 1059-60; *Sanchez*, 891 F.2d at 242.  In order to prevail on a claim involving choices between alternative courses of treatment, a plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that they chose this course in conscious disregard of an excessive risk to plaintiff's health.  *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir.1996) (citing *Farmer*, 511 U.S. at 837).  The evidence here establishes that Defendants chose a course of treatments  that was medically accepted.  Although the medical treatment Plaintiff received may not have been what he considered proper treatment, he presents no evidence that PBSP Defendants were deliberately indifferent to his serious medical needs.  Rather, the undisputed factual record shows that they:

38

(1) continuously monitored and treated Plaintiff; (2) modified his prescribed medications when needed; (3) chose medically acceptable courses of treatment while being aware of the risks associated with his health problems (i.e., muscle/tendon injury and atrophy, CTS, nerve pain, migraines, and high blood pressure); and (4) provided prescription drugs. Thus, Plaintiff has failed to provide evidence regarding an essential element of his claim.

Lastly, Plaintiff's claims regarding previously approved accommodations do not support a claim for deliberate indifference. Defendant Thomas's decision was based on her evaluation and treatment of Plaintiff, medical records, and applicable prison healthcare guidelines. Further, Defendant Thomas determined that Plaintiff's accommodations approved by his prior prison were not medically necessary. Thomas Decl. ¶ 19. Defendant Adam: (1) documented Defendant Thomas's findings; (2) specifically noted Plaintiff's well-built upper body (suggesting he was exercising and working out regularly) and Plaintiff's ability to move his neck and walk in his high-top tennis shoes; and (3) concluded that Plaintiff's conditions were not affecting his daily living activities and he did not need special accommodations. Adam Decl. ¶¶ 10-12. As explained above, under IMSP&P, such accommodations are ordered only when medically necessary. *See* CCHCS, IMSP&P: Vol. 4, Chap. 23, Section 4.23.1. Defendants Thomas and Adam determined that Plaintiff's accommodation requests were not medically necessary because: (1) he was walking fine in his high-top tennis shoes; (2) his knee was fine; and (3) his neck was also fine. Thomas Decl. ¶ 19; Adam Decl. ¶ 46. Given the undisputed evidence, none of Plaintiff's medical conditions or diagnostic tests indicated or established a medical need for such accommodations, specifically, high ankle support boots, a knee brace, or a wedge pillow. Thomas Decl. ¶ 29. Defendants Thomas's and Adam's actions in this regard were not deliberately indifferent, and PBSP Defendants are entitled to summary judgment.

Accordingly, Plaintiff's Eighth Amendment claim fails as a matter of law. Therefore, the court GRANTS PBSP Defendants' motion for summary judgment as to Plaintiff's claim that they were deliberately indifferent to his medical needs.[17]

---

[17] The court's finding that PBSP Defendants are entitled to summary judgment as to Plaintiff's Eighth Amendment claim obviates the need to address PBSP Defendants' alternative argument

## V.     CONCLUSION

For the reasons outlined above, the court orders as follows:

1.     Defendants' unopposed request for judicial notice is GRANTED.  Dkt. 33-2.

2.     Plaintiff is GRANTED leave to file a surreply.  Dkt. 56.

3.     Defendants' dispositive motions are GRANTED.  Dkts. 33, 44.  Judgment shall be entered in favor of Defendants Kelso, Thomas, Sayre, and Adam, and against Plaintiff.  Plaintiff's Eighth Amendment claim against Defendants Bal and McLean is DISMISSED with prejudice.  Finally, the court DISMISSES all remaining claims involving official-capacity damages, punitive damages, and injunctive relief.

4.     The Clerk of the Court shall terminate all pending motions and close the file.  All parties shall bear their own costs.

5.     This Order terminates Docket Nos. 33, 33-2, 44, and 56.

IT IS SO ORDERED.

Dated:  August 3, 2017

_____
DONNA M. RYU
United States Magistrate Judge

that they are entitled to qualified immunity.

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BRUCE PHILLIPPI,

           Plaintiff,

   v.

J. CLARK KELSO, et al.,

           Defendants.

Case No.  4:15-cv-05579-DMR

**CERTIFICATE OF SERVICE**

9
10
11

       I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

12
13
14
15
16

       That on August 3, 2017, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

17
18

Bruce  Phillippi ID: K79951
P.O. Box 921
Imperial, CA 92251

19
20

Dated: August 3, 2017

21
22
23
24
25
26

Susan Y. Soong
Clerk, United States District Court

By:_____
Ivy Lerma Garcia, Deputy Clerk to the
Honorable DONNA M. RYU

27
28